UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF MICHIGAN
SOUTHERN DIVISION

LANCE R. BUSH,

      Plaintiff                  Civil Action No. 04-73997

v.                             HON.  LAWRENCE P. ZATKOFF
                                 U.S. District Judge
                                 HON. R.  STEVEN WHALEN
COMMISSIONER OF SOCIAL        U.S. Magistrate Judge
SECURITY,

      Defendant.

_____/

## <u>REPORT AND RECOMMENDATION</u>

Plaintiff Lance R. Bush brings this action under 42 U.S.C. §405(g) challenging a final decision of Defendant Commissioner denying his application for Supplemental Security Income (SSI) benefits and disability insurance benefits (DIB) under the Social Security Act.  Both parties have filed summary judgment motions which have been referred for a Report and Recommendation pursuant to 28 U.S.C. § 636(b)(1)(B).  I recommend that Defendant's Motion for Summary Judgment be denied, and Plaintiff's Motion for Summary Judgment granted, remanding this case for an award of benefits.

## <u>PROCEDURAL HISTORY</u>

On September 26, 2002, Plaintiff filed concurrent applications for SSI and DIB

2:04-cv-73997-LPZ-RSW   Doc # 14   Filed 09/19/05   Pg 2 of 25   Pg ID 672

alleging an onset of disability of July 18, 2002 (Tr.369-371).[1] After the denial of his

claim, Plaintiff filed a timely request for an administrative hearing, conducted on

April 23, 2004 in Oak Park, Michigan before Administrative Law Judge (ALJ)

Michael F. Wilenkin. Plaintiff, represented by attorney Kenneth Laritz, testified. (Tr.

576-591). Dr. Isa Brown, Ph.D., acting as Vocational Expert (VE) also testified (Tr.

591-597). ALJ Wilenkin found that Plaintiff was not disabled because although

unable to perform his past relevant work as a cook or factory worker, he retained the

residual functional capacity to perform a range of sedentary work, found in significant

numbers in the national economy (Tr. 26-27). On September 22, 2004, the Appeals

Council denied review (Tr. 10-12). Plaintiff filed for judicial review of the final

decision on October 13, 2004.

## BACKGROUND FACTS

Plaintiff, born November 9, 1962, was age forty-one when the ALJ issued his

decision  (Tr. 369).   He graduated from high school and worked as a cook and a

factory worker   (Tr. 21). Plaintiff alleges an onset date of July 18, 2002 when he

ceased working as a cook due to pain and nausea (Tr. 369, 577).

---

[1]Plaintiff also filed two earlier SSA claims.  Plaintiff first applied for benefits on
October 28, 1997, but failed seek further review after the initial denial (Tr. 21).  He filed
a second application on June 17, 1998, which was also denied at the initial level and upon
reconsideration (Tr. 21 63-64).  Prior to his scheduled hearing he indicated that he had
returned to work, prompting the administrative law judge to dismiss his claim on
September 15, 1999 (Tr. 21, 356).

-2-

### A.   Plaintiff's Testimony

Plaintiff testified that he lived in a flat in Roseville, Michigan with his two children (Tr. 576). Commenting that he seldom drove due to side effects from his pain medication, Plaintiff stated that his wife drove him to the hearing (Tr. 576). He reported that he had graduated from high school, but had not undergone additional vocational training (Tr. 577). He stated that he had worked most recently at the Grosse Pointe Yacht Club as a cook until July, 2002 when "pain, . . .nausea and vomiting" had obliged him to stop working (Tr. 577). He reported that prior to the two years he worked at the yacht club, he was employed as a cook for six to seven years at local restaurants (Tr. 577-578). He testified that before he began work as a cook, he worked for a temporary agency performing factory work (Tr. 578). He indicated that most of the factory jobs required standing for extended periods (Tr. 578). He estimated that he did not lift more than ten pounds in most of his positions (Tr. 579).

Plaintiff stated that he believed his condition had worsened since he ceased working, due to liver damage (Tr. 579). He also reported that he experienced chronic, migratory joint, muscle, and soft tissue pain, which he treated with ice packs or heating pads (Tr. 580). He stated that he experienced chronic fatigue which obliged him to rest after performing routine tasks such as showering or dressing (Tr. 580-581).

Plaintiff reported that he obtained relief from his nausea by taking medication

-3-

twice a day (Tr. 581). He stated that he took 10 milligrams of Norco two or three times a day for "breakthrough pain" and 40 milligrams of Oxycontin twice a day, which he stated relieved his discomfort to an extent (Tr. 582). He testified that he tried to educate himself about fibromyalgia and chronic myofacial pain syndrome, adding that he tried to perform some of the stretching exercises at least minimally each day (Tr. 582).

In addition to migratory pain, Plaintiff testified that he suffered from abdominal pain due to cirrhosis of the liver caused by chronic hepatitis C (Tr. 583). He stated that his physician prescribed Trazodone for depression and that he counseled with a psychologist twice a month (Tr. 585). He stated that since he had begun taking Marinol the previous November, his appetite had improved to the point where he ate "at least twice a day," in contrast to his previous habit of eating as seldom as once every two days (Tr. 586). He reported that he performed only minimal household tasks due to fatigue, but at the encouragement of his counselor, he had begun practicing the organ regularly (Tr. 587).

Plaintiff estimated that he could stand for no more than fifteen minutes without experiencing back spasms or shooting pain in his legs (Tr. 587). He stated that he could sit for a maximum of thirty minutes, but could not stoop, squat, crouch, or kneel on a regular basis (Tr. 588). He estimated that he could lift a maximum of five pounds (Tr. 589). He reported that he usually lay down for one hour during the day, but sometimes needed to rest for up to four hours (Tr. 589). He testified that

-4-

Trazodone made him nauseated when he took it unaccompanied by food (Tr. 590).

He reported that Oxycontin gave him periodic "brain fog" or confusion (Tr. 590).  He

estimated that in a time span of seven to ten days, he experienced one to two "good"

days (Tr. 590).

### B.     Medical Evidence[2]

Medical records from November, 2001 indicate that Plaintiff, formerly

diagnosed with  chronic hepatitis C, complained of left-sided chest pains (Tr. 457).

Mark Kukaj, M.D. noted that Plaintiff appeared well compensated, but required pre-

treatment neurological evaluation prior to undergoing a liver biopsy, due to a history

of seizure disorder (Tr. 442).  X-rays of Plaintiff's cervical spine performed the same

month showed "well preserved" vertebral bodies and disc spaces, with "minimal

degenerative change at the C2-3 level" (Tr. 469).  The same report showed a "slight

dextroconvex curvature of the midthoracic spine," which the reviewing physician

attributed to developmental or remote trauma rather than acute injuries (Tr. 469).

Notes from a May, 2002 examination indicate that Plaintiff experienced back pain

either from his work as a cook or injuring himself in a fall the previous December (Tr.

455).   Plaintiff  denied  pain  radiating  into  his  extremities (Tr. 455).   Ralph F.

---

[2] Plaintiff's transcript includes all medical records, including material applicable to his first two applications.   This report  will limit its discussion to Plaintiff's conditions and treatments occurring after the date of the prior dismissal, with the exception of instances where referencing a previous condition would help determine whether Plaintiff is eligible for benefits subsequent to his current onset date of  July 18, 2002.

Woodbury, M.D. prescribed Valium and recommended that Plaintiff undergo a complete physical (Tr. 455). An examination conducted later the same month revealed that Plaintiff experienced cervical spine tenderness, but only slight limitations on "flexion, extension, lateral flexion, and rotation" (Tr. 454). In August, 2002, Plaintiff continued to complain of neck and back pain, stating that Valium did not relieve his discomfort (Tr. 448). He continued to take Elavil to control his depression (Tr. 447). Notes from a followup appointment state that Plaintiff did not obtain relief from back and neck pain by taking Medrol-Dose-Pack or Kenalog and Xylocaine injections (Tr. 446). The same report states that Plaintiff had started physical therapy (Tr. 446). Plaintiff later informed his physician that taking Soma compound relieved his muscle spasms (Tr. 445). An exam conducted at the end of September, 2002 indicated that a recent electromyogram with nerve conduction studies was normal (Tr. 443). A physical therapy discharge summary composed in October, 2002 states that Plaintiff continued to experience severe neck pain, headaches, and decreased neck and thoracic region mobility (Tr. 471).

In December, 2002, Dawit Tehlahamimounat, D.O., found that Plaintiff exhibited several symptoms of fibromyalgia, including widespread musculoskeletal pain, migraine headaches, and multiple tender points (Tr. 480). Dr. Tehlahamimounat noted that Plaintiff complained of difficulty walking, playing with his children, and house chores (Tr. 481). He found that his gait and posture were within a normal range (Tr. 481). He diagnosed Plaintiff with myofasial pain syndrome and chronic

-6-

fatigue syndrome (Tr. 484).

A Residual Physical Functional Capacity Assessment performed in December, 2002 indicated that Plaintiff experienced hepatitis C, chronic pain and fatigue, depression, panic attacks, no sleep, flu symptoms and night sweats (Tr. 434). The assessment noted that Plaintiff's medical history showed a history of IV drug abuse (Tr. 434). The report concluded that Plaintiff was partially credible (Tr. 434).

In January, 2003 Plaintiff underwent a psychological evaluation performed on behalf of the state's Disability Determination Service (Tr. 488). Terry L. Rudolph, Ph.D., noted that Plaintiff medical history included IV drug use and hepatitis C (Tr. 488). Plaintiff reported taking Trazadone and Kadian (Tr. 488). Plaintiff denied suicidal ideation or auditory or visual hallucinations, but expressed feelings of worthlessness (Tr. 490-491). Dr. Rudolph reported that Plaintiff's calculation skills were intact, and displayed appropriate judgment (Tr. 492). He assigned Plaintiff a GAF of 57, finding that his prognosis was guarded (Tr. 492).[3]

In February, 2003 Bruce G. Douglas, Ph.D. completed a Psychiatric Review Technique Form (PRTF) on behalf of SSA, finding that Plaintiff experienced a depressive disorder (Tr. 416-429). Dr. Douglas also found that Plaintiff experienced mild restrictions of daily living, with moderate difficulties in maintaining social

---

[3]A GAF score of 51-60 indicates moderate symptoms (occasional panic attacks) or moderate difficulty in social, occupational, or school functioning. American Psychiatric Association, *Diagnostic and Statistical Manual of Mental Disorders--Text Revision* at 34 (*DSM-IV-TR* ), 30 (4th ed.2000).

functioning, as well as moderate difficulties maintaining concentration, persistence, or pace (Tr. 426). A Mental Residual Functional Capacity assessment performed at the same time by Dr. Douglas found that Plaintiff experienced moderate limitations in his ability to understand, remember, and carry out detailed instructions, as well as a moderately limited ability to maintain attention and concentration for extended periods (Tr. 430). Dr. Douglas also found that Plaintiff retained a moderately limited ability to complete a normal work week without interruptions (Tr. 431). Dr. Douglas concluded that Plaintiff "may have trouble with complex tasks (Tr. 432). Concentration and pace may be limited . . . . [Plaintiff] retains the capacity to perform simple tasks on a sustained basis" (Tr. 432).

In April, 2003, Plaintiff reported to treating physician Glenn D. Krieger M.D., that he slept only two hours a night, experiencing migratory pain, which lessened somewhat during the day (Tr. 550). Dr. Krieger attributed his pain to myofasial pain syndrome and fibromyalgia, also noting at another appointment in July, 2003 that Plaintiff was losing weight (Tr. 547, 550).

In April, 2003, Plaintiff began psychological treatment for depression (Tr. 502-523). He reported feelings of worthlessness and guilt, due to his inability to support his family (Tr. 523). He indicated further that he experienced panic attacks, difficulty sleeping, depressed energy, and difficulty coping with his daily tasks (Tr. 523). His intake assessment noted that he experienced hepatitis C, chronic fatigue syndrome, fibromyalgia, and myofacial pain syndrome (Tr. 521). Plaintiff indicated that his

-8-

condition sometimes limited his energy to the extent that he experienced difficulty performing personal hygiene tasks (Tr. 515). His therapist identified his "presenting problem" as "[d]epression related to [his] medical condition that prevents employment" (Tr. 513).

Plaintiff stated that although his medical condition had strained his relationship with his wife, he expressed gratitude that she had been patient (Tr. 516). He indicated that he derived strength from attending church and looked forward to his upcoming baptism (Tr. 516). Plaintiff reported that in spite of his illness, he sought to practice "compassion toward others" and endeavored to raise his children with good values (Tr. 516). A treatment summary composed after eleven treatment sessions noted that Plaintiff's GAF score had been elevated from 50 to 57 due to his increased ability to cope with his chronic illness (Tr. 505).

In January, 2004, a pathology report issued by St. John Hospital showed an "early or evolving [liver] cirrhosis . . . . consistent with chronic hepatitis C" (Tr. 494).

February, 2004 medical reports completed by Drs. Tehlahamimounat and Richard Cascio, M.D. indicate that Plaintiff experienced chronic myofasial pain syndrome, fibromyalgia, chronic fatigue syndrome, hepatitis C and depression (Tr. 500-501). A March, 2004 survey completed by Dr. Tehlahamimounat (Fibromyalgia & Myofascial Pain Functional Questionnaire) stated that Plaintiff met the American Rheumatological Association criteria for fibromyalgia, indicating that Plaintiff's

symptoms included multiple tender and trigger points as well as non-restorative sleep and morning stiffness  (Tr. 496).  Dr. Tehlahamimounat also found that Plaintiff experienced myofascial pain syndrome, severe headaches, chronic fatigue, and depression (Tr. 496).  He concluded, based on Plaintiff's pain occurring in his lumbosacral, thoracic, and cervical spine, along with bilateral shoulder, arm, hip, leg, knee, ankle and foot pain, that he was unable to sustain gainful employment (Tr. 497-498).  Dr. Tehlahamimounat opined that Plaintiff was not a malingerer (Tr. 497).

### C.    Vocational Expert Testimony

VE Dr. Isa Brown classified Plaintiff's previous work as a cook as semi-skilled at either a light or medium exertional level, and his previous work as a factory worker as unskilled at the light or sedentary exertional level (Tr. 591).  The VE stated that based on Plaintiff's allegations of "chronic severe pain at multiple sites (sic)," he could not perform any of his previous jobs (Tr. 592).  The ALJ then asked the VE if any jobs were available to Plaintiff given the following limitations:[4]

> "Let's assume the existence of a hypothetical person.  One who was
> vocationally situated as is [Plaintiff] in terms of age, education and past
> relevant work.  With respect to such an imaginary person please assume that
> a reasonable interpretation of the credible medical record would allow for a
> conclusion and support a finding that he retains the residual functional
> capacity to sit six of eight hours of an eight hour work day, stand or walk two

---

[4]The undersigned notes that the hypothetical question above contains sentence fragments and also includes ALJ opinions which appear to stray from the usual format wherein a claimant's occupational limitations are listed.   However, given the hypothetical question's  significance in the review of the administrative decision, the entire question has been left unedited.

of eight hours of an eight hour work day, lift as much as 10 pounds only occasionally, lesser weight somewhat more frequently.  And assume history of complaint of pervasive muscular joint and organ pain associated with chronic fatigue and easy fatigue ability all of which – well undoubtedly his disconcerting is not of sufficient consequence for purposes of this query to interfere with or otherwise preclude functioning at the level I describe.  The record also reflects a history of [h]epatitis C, some hepatic involvement.  There's no evidence of frank liver failure or anything approaching frank liver failure this juncture.   Certainly there's an element of fatigue typically associated with symptomatic manifestations of [h]epatitis C.   While this fatigue is occasion just by virtue of the [h]epatitis or by virtue of some other process, chronic fatigue syndrome or whatever the case may be, it's – probably really doesn't much matter.  If he's tired, he's tired.  Whatever the case you may assume that the fatigue is insufficient to preclude functioning at the level I suggest.  The record reflects there appears to be a history of depression.  There is obviously no intellectual or cognitive deficit occasion to buy this emotional difficulty at all.   This is manifested in the content of the psychological record and the [Plaintiff's] performance this morning, presentation this morning rather.  Thus you may assume that while there may be some emotional difficulties and some emotional ability the hypothetical individual is in no way impaired in terms of his ability to perform the usual and customary cognitive aspects of vocational functioning.   He is notwithstanding these emotional difficulties and I might say not withstanding the modalities employed to treat his various system.  Able to understand, remember and follow instructions, follow through with and complete assigned tasks in a timely and appropriate fashion.  Respond appropriately to customary work pressures, supervisor, personnel, co-worker, the public and the like.  Lastly you may assume that the deficit suffered or again the modalities employed to treat the same do not warrant that the hypothetical individual to lie down during the course of a typical work day.  Consideration of all those limitations, would such a person be able to perform any of [Plaintiff's past relevant jobs?  If not, would he then be able to perform any other work that exists in the geographic areas I mentioned?"

 (Tr. 592-594).

    The VE found that given the above limitations, Plaintiff could not perform his

previous work, but retained the residual functional capacity (RFC) to perform

sedentary work, including jobs which involved sorting, packaging, assembly work,

(piece work) along with public contact work, which involved security monitoring, information clerks, and telemarketing jobs (Tr. 594-595). He stated that approximately 6900 such jobs existed in southeastern Michigan (Tr. 595).

**D.     The ALJ's Decision**

Based on Plaintiff's September 29, 2002 application, ALJ Wilenkin held that Plaintiff was not disabled under the Social Security Act (Tr. 20). Citing Plaintiff's medical records, the ALJ found that Plaintiff had the severe impairments of hepatitis C, myofascial  pain, chronic fatigue, and recurrent depression, finding nonetheless that Plaintiff's impairments did not  "meet or equal in severity, any impairment found in Appendix 1, Subpart P, Regulations No. 4" (Tr. 26).

The ALJ found that while Plaintiff was unable to perform any past relevant work, he retained the RFC for a full range of sedentary work, reduced by his need for a sit/stand option (Tr. 27).   The ALJ found that Plaintiff could perform the unskilled sedentary positions of sorter, packager, visual inspector, assembler (4,700 jobs) in addition to the work of a security monitor, information clerk, or telemarketer (2,200 jobs) (Tr. 26).

In support of his determination, the ALJ stated that he did not find Plaintiff's allegations of limitations "wholly credible," citing his activities of daily living such as playing with his dog, running errands, and watching his children (Tr. 23, 26). The ALJ further discounted Plaintiff's credibility by stating that his claims of limitations were not supported by objective medical evidence (Tr. 26).

-12-

## STANDARD OF REVIEW

The district court reviews the final decision of the Commissioner to determine whether it is supported by substantial evidence.  42 U.S.C. §405(g); *Sherrill v. Secretary of Health and Human Services,* 757 F.2d 803, 804 (6th Cir.  1985). Substantial evidence is more than a scintilla but less that a preponderance.  It is "such relevant evidence as a reasonable mind might accept as adequate to support a conclusion." *Richardson v. Perales,* 402 U.S. 389, 401, 91 S.Ct. 1420, 28 L.Ed.2d 842 (1971) (*quoting Consolidated Edison Co. v. NLRB,* 305 U.S. 197, 229, S. Ct. 206, 83 L.Ed.126 (1938)). The standard of review is deferential and  "presupposes that there is a 'zone of choice' within which decision makers can go either way, without interference from the courts." *Mullen v. Bowen,*  800 F.2d 535, 545 (6th Cir.  1986)(en banc).  In determining whether the evidence is substantial, the court must "take into account whatever in the record fairly detracts from its weight."  *Wages v. Secretary of Health & Human Services*, 755 F.2d 495, 497 (6th Cir. 1985). The court must examine the administrative record as a whole, and may look to any evidence in the record, regardless of whether it has been cited by the ALJ.  *Walker v. Secretary of Health and Human Services*, 884 F.2d 241, 245 (6th Cir. 1989).

## FRAMEWORK FOR DISABILITY DETERMINATIONS

Disability is defined in the Social Security Act as the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can

-13-

be expected to last for a continuous period of not less than 12 months." 42 U.S.C.

§423(d)(1)(A). In evaluating whether a claimant is disabled, the Commissioner is to

consider, in sequence, whether the claimant: 1) worked during the alleged period of

disability; 2) has a severe impairment; 3) has an impairment that meets or equals the

requirements of an impairment listed in the regulations; 4) can return to past relevant

work; and 5) if not, whether he or she can perform other work in the national

economy.  20 C.F.R. §416.920(a).  The Plaintiff has the burden of proof as steps one

through four, but the burden shifts to the Commissioner at step five  to demonstrate

that, "notwithstanding the claimant's impairment, he retains the residual functional

capacity to perform specific jobs existing in the national economy."  *Richardson v.*

*Secretary of Health & Human Services,* 735 F.2d 962, 964 (6th Cir.1984).

## ANALYSIS

### A.    Hypothetical Question

Plaintiff argues that the hypothetical question posed by the ALJ did not

encompass his mental limitations. *Plaintiff's Brief* at 11.  He points out that while his

Mental Residual Functional Capacity Assessment noted that he possessed a

moderately limited ability to maintain attention and concentration for extended

periods along with the same limitations in completing a normal workday without

interruptions from psychologically based symptoms, the ALJ explicitly stated that the

hypothetical individual was "no way impaired in terms of his ability to perform the

usual and customary cognitive aspects of vocational functioning." *Id.* citing (Tr. 593-

-14-

594).

Sixth Circuit case law supports Plaintiff's argument that a hypothetical question must accurately reflect an individual's limitations. *See Varley v. Secretary of HHS,* 820 F.2d 777, 779 (6th Cir. 1997)(A hypothetical question constitutes substantial evidence only if it accurately portrays the individual's physical and mental impairments.) More recently, in *Webb v. Commissioner of Social Sec.* 368 F.3d 629 (6th Cir. 2004), the court rejected the proposition that an ALJ is required to list all of a claimant's maladies verbatim in the hypothetical question. Nonetheless, the *Webb* court acknowledged that "[t]he hypothetical question . . . should include an accurate portrayal of [a claimant's] individual physical and mental impairments." (internal citations omitted) *Id.* at 632, *quoting Varley, supra,* 820 F.2d at 779. *See also Smith v. Halter,* 307 F.3d 377, 379 (6th Cir. 2001).

In the present case, the ALJ's hypothetical question not only failed to include Plaintiff's relevant non-exertional limitations created by depression, but explicitly directed the VE to omit any consideration of the effects of Plaintiff's depression in making his occupational findings.   While "the ALJ is not obliged to incorporate unsubstantiated complaints into his hypotheticals," *Stanley v. Secretary of Health and Human Services,* 39 F.3d 115,118-119 (6th Cir.1994), *quoting Hardaway v. Secretary of Health & Human Servs.,* 823 F.2d 922, 927-28 (6th Cir.1987)*,* Plaintiff's depression cannot be deemed "unsubstantiated" by any reasonable interpretation of his medical records. First, Plaintiff's mental health evaluation, performed in January,

2003 by a state examiner, found that he suffered from a depressive disorder (Tr. 492). He was assigned a GAF of 57, which indicates "moderate difficulty in social, *occupational*, or school functioning" (Tr. 492) (emphasis added). In April, 2003, Plaintiff again received a diagnosis of depression when he sought additional mental health treatment (Tr. 502-523). Although medical notes made by his care givers indicate that he displayed good motivation and an ability to acknowledge problem areas, in August, 2003, consistent with the findings of the state's medical examiner, Plaintiff was again assessed a GAF of 57 (Tr. 503, 505-506). Second, the hypothetical question appears to ignore the conclusions reached in the PRTF and Mental Residual Functional Capacity assessment of February, 2003 which stated that Plaintiff's ability to maintain the concentration, persistence, or pace necessary to sustain full-time employment was moderately limited (Tr.430). The same assessment ended by reiterating Plaintiff's mental limitations by stated that "[c]oncentration and pace may be limited" and that he retained the capacity to perform *simple* tasks (emphasis added) (Tr. 432).

Moreover, if the ALJ discounted the findings of mental limitations, including the opinions of his regular treatment providers, his rationale for rejecting their opinions should have been included in his findings. The ALJ "must articulate, at some minimum level, his analysis of the evidence to allow the appellate court to trace the path of his reasoning." *Lowery v. Commissioner, Social Sec. Administration,* 55 Fed.Appx. 333, 339, WL 236419, 5 (6th Cir. 2003); *Diaz v. Chater,* 55 F.3d 300,

-16-

306 (7th Cir.1995). Likewise, the administrative decision omits any criticism of the January, February, and April, 2003 depression diagnoses, and indeed, acknowledges at Step two that Plaintiff suffers from "recurrent" depression (Tr. 26). [5] The VE's conclusion, adopted by the ALJ but based on an incomplete description of Plaintiff's limitations, cannot serve as substantial evidence.  The SSA failed to meet its burden at Step Five and for this reason alone, the case should be remanded.

### B.        Treating Physician

Plaintiff also maintains that the ALJ erred in his refusal to lend credence to his treating physician's finding that he was disabled as the result of fibromyalgia. *Plaintiff's Brief* at 9.  He also argues that the ALJ improperly discounted his physician's opinions by citing Plaintiff's activities in 1998.  *Id.* at 10.

In *Jones v. Secretary of Health and Human Services*, 945 F.2d 1365, 1370 (footnote 7) (6th Cir. 1991) the court held that  "it is well-settled in this circuit that treating physicians' opinions, based on objective evidence, should be accorded significant weight.   If uncontradicted, the physicians' opinions are entitled to complete deference." In *Wilson v. Commissioner of Social Sec.* 378 F.3d 541, 544  (6th Cir. 2004) the court stated:

> "If the opinion of a treating source is not accorded controlling weight, an ALJ must apply certain factors--namely, the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the

---

[5]The ALJ mentions the depression diagnosis of the January, 2003 state examination, but discusses the findings primarily for the purpose of discounting Plaintiff's allegations of chronic fatigue and fibromyalgia (Tr. 24).

record as a whole, and the specialization of the treating source--in determining
what weight to give the opinion."

Moreover the "ALJ must "give good reasons" for not giving weight to a treating
physician in the context of a disability determination." *Id.*; 20 C.F.R.
§404.1527(d)(2) (2004).

Independent of the problematic hypothetical question discussed in section **A.**, the
ALJ's rejection of Dr. Tehlahamimounat's opinion constitutes reversible error for a number
of reasons. First, the administrative decision, which rejects the physician's diagnosis of
myofascial pain, complete omits any mention of the accompanying diagnosis of
fibromyalgia. If the ALJ overlooked a significant portion of the treating physician's
disability opinion, his analysis is insufficient, pursuant to *Wilson.*

If, on the other hand, the Court construes the ALJ's discussion of myofascial pain
to include the physician's fibromyalgia opinion, the ALJ's finding become problematic for
other reasons. He states that "all objective diagnostic testing has been negative," but fails
to note that legitimate cases of fibromyalgia, which often elude detection using conventional
diagnostic tools, mandate an alternative test which places greater weight than usual on the
treating physician's opinion, in spite of the absence of objective medical evidence. In this
regard, the Sixth Circuit in *Preston v. Secretary of Health and Human Services*, 854 F.2d
815, 817 -818 (6th Cir. 1988), stated:

> "In stark contrast to the unremitting pain of which fibrositis [FMS] patients
> complain, physical examinations will usually yield normal results--a full range
> of motion, no joint swelling, as well as normal muscle strength and
> neurological reactions. *There are no objective tests which can conclusively*

-18-

2:04-cv-73997-LPZ-RSW   Doc # 14   Filed 09/19/05   Pg 19 of 25   Pg ID 689

*confirm the disease*; rather it is a process of diagnosis by exclusion and testing of certain 'focal tender points' on the body for acute tenderness which is characteristic in fibrositis patients." (emphasis added).

In 1990, the American College of Rheumatology established the presence of 11 tender points as a diagnostic criterion of fibromyalgia.[6]  In the present case, Plaintiff's treating physician found multiple tender and trigger points, recording that Plaintiff experienced pain in a total of *fifteen* locations, along with migraine headaches and widespread musculoskeletal pain (Tr. 496, 497). Thus, regardless of negative "objective diagnostic testing," the Plaintiff met the diagnostic criteria for fibromyalgia established by the American College of Rheumatology.  The ALJ ignored these established criteria, and instead relied on so-called negative findings which the court in *Preston* rejected as a basis for evaluating claims of fibromyalgia.[7]

There are additional problems with the ALJ's treating physician analysis.  The ALJ discounts Dr. Tehlahamimounat's opinion  in part by citing Plaintiff's stated daily activities of 1998 - four years before alleged onset of Plaintiff's current claim of disability and long before his fibromyalgia diagnosis.  In addition, the ALJ made much of medical reports

---

[6]While there is a technical distinction between "tender points" and "trigger points," the terms are often used interchangeably.  S. Stonecypher, "Diagnosis of Fibromyalgia," www.lclark.edu/~sherrons/diagnosis.htm.

[7] The ALJ's unsupported rejection of Dr. Tehlahamimounat's opinion also affected his Step Two determination, where he improperly failed to list fibromyalgia as a severe impairment.  In this Circuit, the Step Two severity regulation has been construed as a *de minimis* hurdle in the disability determination process.  *Higgs v. Bowen*, 880 F.2d 860, 862 (6th Cir. 1988).

-19-

(mostly from 1997 and 1998 which predate the claimed disability date) indicating that the Plaintiff "has consistently been described as presenting with a normal posture and gait with no difficulty standing, walking or sitting" (Tr. 24). Apart from the age of those reports, the fact that the Plaintiff might at a particular examination show "normal posture and gait" simply has nothing to do with whether he is disabled as the result of fibromyalgia, myofacial pain syndrome or chronic fatigue syndrome. Indeed, Dr. Tehlahamimounat himself noted that gait and posture were within a normal range (Tr. 481). Fibromyalgia is a chronic condition that causes pain, stiffness, and tenderness of the muscles, tendons and joints, and other fibromyalgia characteristics include restless sleep, awakening feeling tired, fatigue, and anxiety. *See www.focusonarthritis.com- Diseases and Conditions-Fibromyalgia* (2003). That one might appear to have a normal posture does not negate a finding of chronic, widespread or generalized pain that would preclude substantial, gainful employment.

In short, the ALJ's "reasons" for rejecting the treating physician's opinion are not supported by substantial evidence, and are therefore not "good reasons," as required by *Wilson*.

### C. Credibility

Likewise, the ALJ's assessment of Plaintiff's credibility is suspect. While generally, an ALJ's credibility findings are granted deference by the reviewing court, they must be supported by substantial evidence in the record. *Howard v. Commissioner of Social Security,* 276 F.3d 235, 242 (6th Cir. 2002); *Heston v. Commissioner of Social Security,* 245 F.3d 528, 536 (6th Cir. 2001); *Felisky v. Bowen,* 35 F.3d 1027, 1036 (6th Cir. 1994).

-20-

The ALJ's emphasis on irrelevant and obscure portions of the transcript amounts to a distortion of Plaintiff's testimony and medical history.  First, as noted by Plaintiff, the administrative decision inappropriately pads its credibility determination by citing Plaintiff's daily activities in 1998 in an attempt to illustrate an absence of disability for a claim made four years later, in September, 2002 (Tr. 24).  The decision further attacks Plaintiff's credibility by suggesting that in 1998,  Plaintiff "falsely" stated to a physician that he had been alcohol free since 1996, when in fact, he had admitted alcohol use as late as September, 1997 (Tr. 25, 218, 284).  If true, such a minor inconsistency as to dates–as likely attributable to innocent misstatement as to intentional falsehood– is not only irrelevant to the *current* disability determination, but immaterial to the more obvious point:   None of Plaintiff's current medical providers disputes his contention that he remained alcohol and drug free for several years before making his present claim.[8]

---

[8] The ALJ also stated, "In June 1998, the claimant reportedly suffered another seizure but there is no evidence as to whether the claimant was drinking or using drugs because he declined treatment (Exhibit 17F)" (Tr. 25).  To the extent the ALJ infers that Plaintiff's seizure in June of 1998 may have been due to alcohol or drug consumption, he erred, for two reasons.  First, Exhibit 17F (Tr. 283-87), a report from Dr. Valerie Curtis sent to Dr. Dukaj, notes a seizure on June 3, 1998, but nowhere indicates that Plaintiff "declined treatment."  In fact, the report correctly states that "[r]egarding the seizures, [Plaintiff] had been treated by Dr. Policherla" (Tr. 283).  Secondly, it is error for an ALJ to infer or speculate that Plaintiff had been drinking or taking drugs in the absence of affirmative evidence that this was so.  *See Coulston v. Apfel*, 224 F.3d 897, 901(8th cir. 2000)(concurring opinion of Bye, J.) ("I conclude that the ALJ's decision is *not* supported by 'substantial evidence,' for the simple reason that the Commissioner introduced no evidence to controvert Coulston's account of events...As a matter of logic, the utter absence of evidence in the record cannot be deemed 'substantial'")(emphasis in original); *Gilbrook v. City of Westminster*, 177 F.3d 839, 871 (9th cir. 1999) (drawing inference "from lack of evidence would amount to no more than speculation").

-21-

Second, the portions of the decision which cite Plaintiff's activities from the current period, such as playing the organ and running errands, fail to note that Plaintiff performs those chores and pastimes *intermittently* rather regularly. Plaintiff's ability to perform some basic daily activities sporadically does not preclude a finding of disability. *See Walston v. Gardner,* 381 F.2d 580, 586 (6th Cir.1967) (An individual's performance of everyday tasks in spite of great pain does not indicate that he or she is capable of substantial gainful activity); *Flores v. Massanari,* 19 Fed.Appx. 393, 404, 2001 WL 1092796, 8 (7th Cir. 2001) (The plaintiff's ability to perform household tasks only on "good days" could not be used to support a finding of non-disability). In *Carradine v. Barnhart*, 360 F.3d 751, 755-56 (7th Cir. 2004), Judge Posner criticized the over-reliance on sporadic daily activities in making credibility determinations:

> "[The ALJ] failed to consider the difference between a person's being able to engage in sporadic physical activities and her being able to work eight hours a day five consecutive days of the week....[The claimant] does not claim to be in wracking pain every minute of the day. When she feels better for a little while, she can drive, shop, do housework. It does not follow that she can maintain concentration and effort over the full course of the work week."

Likewise, Plaintiff's daily activities form indicates that he "rarely" fixed his own meals and on the occasions that he did so, he opened a can of soup or made a sandwich (Tr. 396). He estimated that he washed the dishes only twice a week (Tr. 397). Although the ALJ used Plaintiff's acknowledgment that he attended church each Sunday to discredit his testimony that he could not sit for more than half an hour, his ability to sit through a one

-22-

hour service once a week (even assuming that he sits through the entire service) does not by itself  belie his assertion that he cannot sit for half an hour on a regular basis (Tr. 25, 399).

Because the ALJ's decision is not supported by substantial evidence, a remand is required.  The final question is whether to remand for further administrative proceedings and findings or to remand for an award of benefits using Plaintiff's disability onset date for calculating past due benefits. *Faucher v. Secretary of Health and Human Services*, 17 F.3d 171, 176 (6th Cir. 1994), and *Newkirk v. Shalala*, 25 F.3d 316, 318 (6th Cir. 1994), hold that it is appropriate to remand for an award of benefits when "all essential factual issues have been resolved and the record adequately establishes a plaintiff's entitlement to benefits." *Id.*  This entitlement is established if "the decision is clearly erroneous, proof of disability is overwhelming, or proof of disability is strong and evidence to the contrary is lacking. *Faucher,* 17 F.3d at 176 (citing *Mowery v. Heckler*, 771 F.2d rectification, 973 (6th Cir. 1985)).    While the errors in the ALJ's flawed hypothetical question and credibility determination might suggest only a need for further fact-finding at the administrative level, the opinion of Plaintiff's treating physician, supported by appropriate diagnostic techniques, strongly shows that Plaintiff is unable sustain gainful employment. There is little, if anything in this record that materially contradicts this opinion, which was improperly rejected by the ALJ, and which adequately supports Plaintiff's entitlement to benefits, pursuant to *Faucher***.**

**CONCLUSION**

-23-

For the reasons stated above, I recommend that Defendant's Motion for Summary Judgment be DENIED, that Plaintiff's Motion for Summary Judgment GRANTED, and that the case be remanded for an award of benefits.

Any objections to this Report and Recommendation must be filed within ten (10) days of service of a copy hereof as provided for in 28 U.S.C. §636(b)(1) and E.D. Mich. LR 72.1(d)(2). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn,* 474 U.S. 140, 106 S.Ct. 466, 88 L.Ed.2d 435 (1985); *Howard v. Secretary of HHS,* 932 F.2d 505 (6th Cir. 1991); *United States v. Walters,* 638 F.2d 947 (6th Cir. 1981). Filing of objections which raise some issues but fail to raise others with specificity will not preserve all the objections a party might have to this Report and Recommendation. *Willis v. Secretary of HHS,* 931 F.2d 390, 401 (6th Cir. 1991); *Smith v. Detroit Fed'n of Teachers Local 231,* 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this Magistrate Judge.

Within ten (10) days of service of any objecting party's timely filed objections, the opposing party may file a response. The response shall be not more than twenty (20) pages in length unless by motion and order such page limit is extended by the court. The response shall address specifically, and in the same order raised, each issue contained within the objections.

s/R. STEVEN WHALEN
UNITED STATES MAGISTRATE JUDGE

Dated:  September 19, 2005

-24-

<u>CERTIFICATE OF SERVICE</u>

<u>The undersigned certifies that a copy of the foregoing order was served on the attorneys and/or parties of record by electronic means or U.S. Mail on September 19, 2005.</u>

<u>s/Susan Jefferson</u>
Case Manager